## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **GB HOLDINGS OF GEORGIA, INC.,** | ) | |
| | ) | |
| Debtor. | ) | **CASE NO. 1:19-bk-67772** |
| | ) | |
| | ) | **CHAPTER 13** |
| **CHONDRITE ASSET TRUST,** | ) | |
| **SERIES 2015-OCC1, US BANK** | ) | **JUDGE PAUL M. BAISIER** |
| **AS TRUSTEE,** | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **CHARLES EDWARD MCCORKLE,** | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## <u>MOTION FOR RELIEF FROM STAY</u>

COMES NOW, SECURED INVESTMENT FUNDING, LLC, movant in the above-styled action and moves this Court pursuant to 11 U.S.C. 362(d) for an Order for relief from the stay entered in the above-styled case for the purpose of granting the aforementioned movant the right to proceed to obtain possession of and sell real properties at 4225 Snapfinger Woods Drive, Decatur, Dekalb County,

Georgia 30035 being more particularly described in Exhibit "A", attached hereto and made a part thereof.  In support of their Motion herein, the movant shows this Court the following:

## **INTRODUCTION**

On or about December 23, 2015, GB Holdings of Georgia, Inc. ("Debtor") executed a Security Deed in favor of Secured Investment Funding, LLC ("Movant") for property known as 4225 Snapfinger Drive, Decatur, Dekalb County, Georgia 30035 ("the Property"), whereby the Security Deed secured a promissory note in the original amount of One Hundred eighty-six Thousand  and 0/100 Dollars ($186,000.00). (See Exhibit "B"). The Security Deed is recorded at Deed Book 25369, Page 20, Dekalb County records.  (See Exhibit "C").  On the 12th day of January, 2016 Secured Investment Funding, LLC assigned, granted bargained, sold and conveyed, and transferred its rights in the Property to Chondrite Asset Trust, Series 2015-OCC1, US Band as Trustee. The Assignment of Mortgage is attached as Exhibit "D". Movant shows that Debtor has defaulted under the promissory note, and movant sent a notice to Debtor regarding his default on September 25, 2019. (See Exhibit "E").  Movant advertised the property for foreclosure during the month of October for the foreclosure sale to occur on

2

November 5, 2019. (See Notice of Sale Under Power attached hereto as Exhibit "F"). Debtor filed his Voluntary Petition with this Court on the 5th day of November, 2019-, whereby the foreclosure proceedings were stayed. (See Notice of Bankruptcy attached as Exhibit "G").

## ARGUMENT AND CITATION OF AUTHORITY

The Bankruptcy Code allows for an stay to be lifted in order for foreclosure proceedings to continue, stating that "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of [11 U.S.C. § 362] such as by terminating, annulling, modifying, or conditioning such stay... (2) with respect to a stay of an act against property under subsection (a) of this section, if ... (A) the debtor does not have an equity in such property..." 11 U.S.C. § 362(d)(2)(A). A motion to lift stay can be granted when there is no equitable cushion to protect the secured creditor. *In re Standard Building Associates, Ltd.*, 85 B.R. 644, 646 (Bankr. N.D. Ga. 1988). In the case at hand, the Debtor filed his Chapter 13 Bankruptcy Petition on 5th day of November, 2019. Movant advertised the property for a foreclosure sale on the first Tuesday in October 2019. A motion to lift stay may therefore be granted.

## CONCLUSION

Based on the aforementioned, the Movant respectfully requests that this Court grant its Motion to Lift Stay pursuant to 11 U.S.C. § 362(d) and allow the Movant to conduct the foreclosure on the property.

This 15th day of November, 2019.

**STEVENS, STEVENS & OLIVER, LLC**

*/s/ Andrew M. Stevens*
Andrew M. Stevens
Georgia Bar No. 680632
*Attorney for Plaintiff*

4167 Roswell Road, Suite A Floor 1
Atlanta, Georgia 30342
(T) (770) 393-8900
(F) (770) 392-0367
astevens@lawstevens.com

## EXHIBIT "A"

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS NOS. 126 AND 131, OF THE 15TH DISTRICT, OF DEKALB COUNTY, GEORGIA, BEING 2.134 ACRES, MORE OR LESS, AS PER PLAT OF SURVEY BY TRAVIS N. PRUITT, SR., GRLS, DATED July 19, 1973, REVISED July 29, 1973, BEING IMPROVED PROPERTY NOW OR FORMERLY KNOWN AS 4225 SNAPFINGER WOODS DRIVE A/K/A , 2575 WESLEY CHAPEL ROAD, ACCORDING TO THE PRESENT SYSTEM OF NUMBERING IN DEKALB COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT AN IRON PIN ON THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AS NOW RELOCATED A DISTANCE OF 175 FEET WESTERLY FROM THE INTERSECTION FORMED BY THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AND THE WESTERLY RIGHT-OF-WAY OF WESLEY CHAPEL ROAD AS NOW RELOCATED; RUNNING THENCE SOUTHERLY 25 DEGREES 25 MINUTES 55 SECONDS WEST A DISTANCE OF 200 FEET TO AN IRON PIN; RUNNING THENCE SOUTH 39 DEGREES 13 MINUTES 48 SECONDS WEST A DISTANCE OF 131.56 FEET TO AN IRON POINT; RUNNING THENCE SOUTH 31 DEGREES 39 MINUTES 01 SECOND WEST A DISTANCE OF 150.00 FEET TO AN IRON PIN; RUNNING THENCE NORTH 76 DEGREES 09 MINUTES 33 SECONDS WEST A DISTANCE OF 139.67 FEET TO AN IRON PIN; RUNNING THENCE NORTH 01 DEGREE 59 MINUTES 11 SECONDS EAST A DISTANCE OF 298.69 FEET TO AN IRON PIN ON THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD; RUNNING THENCE NORTH 75 DEGREES 34 MINUTES 14 SECONDS EAST ALONG THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD A DISTANCE OF 205.52 FEET TO A POINT; CONTINUING THENCE EASTERLY ALONG THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AN ARC DISTANCE OF 176.40 FEET TO THE POINT OF BEGINNING.

LESS AND EXCEPT:
ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS NOS. 126 AND 131, OF THE 15TH DISTRICT, OF DEKALB COUNTY, GEORGIA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TO FIND THE TRUE POINT OF BEGINNING, BEGIN AT AN IRON PIN ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD, AS NOW RELOCATED, A DISTANCE OF 175 FEET WESTERLY FROM THE INTERSECTION FORMED BY THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AND THE WESTERLY RIGHT-OF-WAY LINE OF WESLEY CHAPEL ROAD, AS NOW RELOCATED; RUN THENCE WESTERLY ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD A DISTANCE OF 176.4 FEET TO AN IRON PIN; THENCE CONTINUE ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD 79.64 FEET TO AN IRON PIN, WHICH IS THE TRUE POINT OF BEGINNING FOR PROPERTY HEREIN CONVEYED; THENCE SOUTH 0 DEGREE 50 MINUTES 25 SECONDS WEST A DISTANCE OF 210.63 FEET TO AN IRON PIN; THENCE WESTERLY A DISTANCE OF 125 FEET TO A POINT; THENCE NORTH 01 DEGREE 59 MINUTES 11 SECONDS EAST A DISTANCE OF 180 FEET, MORE OR LESS, TO AN IRON PIN LOCATED ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD; THENCE EASTERLY ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD A DISTANCE OF 127 FEET TO THE TRUE POINT OF BEGINNING FOR PROPERTY HEREIN CONVEYED.

LESS AND EXCEPT:
ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS NOS. 126 AND 131, OF THE 15TH DISTRICT, CONTAINING 1.00 ACRE, MORE OR LESS, AS SHOWN ON PLAT OF SURVEY BY TRAVIS PRUITT & ASSOCIATES, PC, DATED April 29, 1974, AND REVISED June 26, 1974 AND April 10, 1975, OF DEKALB COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD (SAID ROAD HAVING A 100-FEET RIGHT-OF-WAY) A DISTANCE OF 175 FEET WESTERLY FROM THE INTERSECTION FORMED BY THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AND THE WESTERLY RIGHT-OF-WAY LINE OF WESLEY CHAPEL ROAD (SAID ROAD HAVING A 150-FEET RIGHT-OF-WAY); THENCE SOUTH 25 DEGREES 25 MINUTES 55 SECONDS WEST A DISTANCE OF 200 FEET TO AN IRON PIN; RUNNING THENCE SOUTH 39 DEGREES 13 MINUTES 48 SECONDS WEST A DISTANCE OF 103.67 FEET TO AN IRON PIN; RUNNING THENCE NORTH 88 DEGREES 00 MINUTE 49 SECONDS WEST A DISTANCE OF 102.68 FEET TO AN IRON POINT; RUNNING THENCE NORTH 0 DEGREE 50 MINUTES 25 SECONDS EAST A DISTANCE OF 210.63 FEET TO AN IRON PIN ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD; RUNNING THENCE NORTH 75 DEGREES 34 MINUTES 14 SECONDS EAST A DISTANCE OF 79.60 FEET ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD TO AN IRON PIN AND A POINT OF TANGENCY; THENCE 176.40 FEET ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD FOLLOWING A REGULAR CIRCULAR CURVE HAVING A RADIUS OF 904.93 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH:

DEED BOOK 23572 Pg 452
Debra DeBerry
Clerk of Superior Court
DeKalb County, Georgia

ALL RIGHTS, TITLE, AND INTEREST IN AND TO THAT CERTAIN ACCESS EASEMENT DATED June 8, 1972, BY AND BETWEEN NAREDEL PROPERTIES OF GEORGIA II, A LIMITED PARTNERSHIP AND PHILLIPS LAND COMPANY, INC., AS RECORDED AT DEED BOOK 3080, PAGE 549, DEKALB COUNTY, GEORGIA RECORDS.

BEING THE SAME PROPERTY AS THAT CONVEYED BY LIMITED WARRANTY DEED DATED October, 1996, FROM JAMES C. WALLACE TO CHARLES E. MCCORKLE, AS RECORDED October 29, 1996, AT DEED BOOK 9192, PAGE 628, DEKALB COUNTY, GEORGIA RECORDS.





December 23, 2015

Charles Edward McCorkle
3975 Jackson Shoals Ct.
Lawrenceville, GA 30034

Property Address:  4225 Snapfinger Woods Drive, Decatur, GA 30035
Loan #: **10672**

     The amount of your loan with us is **$186,000.00**.  Interest will be charged on unpaid
principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of
**12.99%**. Your payment is due on the 1st of every month with your first payment being due on
February 1, 2016. Your payment amount is **$2,013.45.**
     The Loan shall mature on January 1, 2018 (the "Maturity Date") at which time the entire
unpaid principal balance together with all accrued and unpaid interest shall be due and payable. If
a payment is received any later than the 5th of each month it will be considered late and your
**interest rate shall increase to the rate of 15.00% for the duration of this loan.** Please mail
your payments to:

Secured Investment Lending
1485 International Parkway, Ste. 1031
Lake Mary, FL 32746


_____         <u>December 23, 2015</u>
Charles Edward McCorkle                        Date

1

## BALLOON NOTE
### (Fixed Rate)

THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE.  LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME.  YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

December 23, 2015                                     Winter Park, Florida

4225 Snapfinger Woods Drive Decatur, GA 30035
[Property Address]

Lender: Secured Investment Funding, LLC a Florida Limited Liability Company
Loan # 10672

1.      **BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$186,000.00** (this amount is called "Principal"), plus interest, to the order of Lenders Servicing Agent. Lenders Servicing Agent is Secured Investment Lending Corp.  I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2.      **INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **12.99%**. **In the event that any payment is late this interest rate shall increase to the rate of 15.00% for the duration of this loan** A payment shall be deemed late when it remains unpaid for 4 days past its due date. This late payment interest rate shall remain in effect for the remaining term of the loan or until all principal and interest payments are paid in full and all terms are satisfied.

After any default described in Section 6(B) of this Note interest shall thereafter accrue at the maximum rate allowed by law.

3.      **PAYMENTS**

(A) **Time and Place of Payments**

I will pay interest by making a payment every month.

I will make my monthly payments on the 1st day of each month beginning on **February 1st, 2016**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest. If, on **January 1st, 2019** I still owe amounts under this Note, I will pay those amounts in full on that

2

date, which is called the "Maturity Date."

I will make my monthly payments at **1485 International Parkway, Ste. 1031, Lake Mary, FL 32746** or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. **$2,013.45**

**4.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.    BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 4th calendar day after the date it is due, I will be subject to a late payment interest rate increase. The new interest rate for the remaining term of the loan or until all principal and interest payments are paid in fill and all terms are satisfied  shall be 15.00%.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in

3

enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

**11.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER.**

As used in this Section "Interest in the Property" means any legal or beneficial interest in the Property, including,

but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The

4

notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Sections (6) and/or (7) within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Payable at: **1485 International Parkway, Ste. 1031, Lake Mary, FL 32746** or such other place as shall be designated by the holder of this note in writing. To be marked as Personal and Confidential.

_____ L.S
Charles Edward McCorkle

Maker's Address

**1485 International Parkway, Ste. 1031
Lake Mary, FL 32746**

5



2016022136    DEED BOOK **25369** Pg **20**

Georgia Intangible Tax Paid $0.00

Filed and Recorded:
1/25/2016 4:31:27 PM
Debra DeBerry
Clerk of Superior Court
DeKalb County, Georgia

Return Recorded Document to:
**Shafritz & Dean, LLC**
**5825 Glenridge Drive**
**Building 2, Suite 212**
**Atlanta, Georgia 30328**

15-1462

------------------------------------- [Space Above This Line For Recording Data] -------------------------------------
File #: **15-1462H**

## SECURITY DEED

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** **"Security Instrument"** means this document, which is dated **December 23, 2015**, together with all Riders to this document.
**(B)** **"Borrower"** is **GB HOLDINGS OF GEORGIA, INC.**  Borrower is the grantor under this Security Instrument.
**(C)** **"Lender"** is **SECURED INVESTMENT FUNDING LLC.**Lender is a LLC organized and existing under the laws of **FLORIDA**. Lender's address is **1485 INTERNATIONAL PARKWAY SUITE 1031, LAKE MARY, FL 32746**.  Lender is the grantee under this Security Instrument.
**(D)** **"Note"** means the promissory note signed by Borrower and dated **December 23, 2015**. The Note states that Borrower owes Lender **One Hundred Eighty-Six Thousand and 00/100** (U.S. **$186,000.00**) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **January 1, 2018**.
**(E)** **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(F)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(G)** **"Riders"** means all riders to this Security Instrument that are executed by Borrower.  The following riders are to be executed by Borrower [check box as applicable]:

[　]Adjustable Rate Rider　　[　]Condominium Rider　　[　]Second Home Rider
[　]Balloon Rider　　[　]Planned Unit Development Rider
[　]1-4 Family rider　　[　]Biweekly Payment Rider　　[　X　] Other(s)　[Specify] <u>WAIVER OF BRWRS RIGHTS</u>

GEORGIA---Single Family---Fannie Mae/Freddie Mac UNIFORM INSTRUMENT　　　　Form 3011 1/01 *(Page 1 of 13)*

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I) "Community Association Dues, Fees and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Escrow Items"** means those items that are described in Section 3.

**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the County of **DeKalb**,                                              State of Georgia
[Type of Recording Jurisdiction]            [Name of Recording Jurisdiction]

which currently has the address of:        **4225 SNAPFINGER WOODS DRIVE**
                                            [Street]

**DECATUR**,  Georgia                        30035 ("Property Address"):
[City]                                       [Zip Code]

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also

be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and nonuniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
   **1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges**. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
   Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.
   **2. Application of Payments or Proceeds**. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.
   If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.
   Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

DEED BOOK 25365 Pg 23

**3. Funds for Escrow Items**. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by ender.

**4. Charges; Liens**. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or

DEED BOOK 25369 Pg 24

ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken

DEED BOOK 25369 Pg 25

promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy**. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections**. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application**. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument**. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the

Property (as set forth below). Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, draining water from pipes, and eliminating building or other code violations or dangerous conditions. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until the Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a)  Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.  Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b)  Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11.  Assignment of Miscellaneous Proceeds; Forfeiture**. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of

DEED BOOK 25369 Ps 28

Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's through

DEED BOOK 25369 Ps 29

that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no

DEED BOOK  25369 Pg 30

acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.**   The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

DEED BOOK 25369 Ps 31

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by Applicable Law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale. Lender shall give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.

Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by Applicable Law.

If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** Borrower waives all rights of homestead exemption in the Property.

**25. Assumption Not a Novation.** Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

**26. Security Deed.** This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

Signed, Sealed and delivered in the presence of:

GEORGIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3011   1/01 (Page 12 of 13)

DEED BOOK 25369 Ps 32



GB HOLDINGS OF GEORGIA, INC

_____ (Seal)
CHARLES EDWARD MCCORKLE    -Borrower

Unofficial Witness

_____ (Seal)
-Borrower

Notary Public

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____[Space Below This Line For Acknowledgement]_____

DEED BOOK 25369 Ps 33

# EXHIBIT "A"

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS NOS. 126 AND 131, OF THE 15TH DISTRICT, OF DEKALB COUNTY, GEORGIA, BEING 2.134 ACRES, MORE OR LESS, AS PER PLAT OF SURVEY BY TRAVIS N. PRUITT, SR., GRLS, DATED July 19, 1973, REVISED July 29, 1973, BEING IMPROVED PROPERTY NOW OR FORMERLY KNOWN AS 4225 SNAPFINGER WOODS DRIVE A/K/A , 2575 WESLEY CHAPEL ROAD, ACCORDING TO THE PRESENT SYSTEM OF NUMBERING IN DEKALB COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT AN IRON PIN ON THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AS NOW RELOCATED A DISTANCE OF 175 FEET WESTERLY FROM THE INTERSECTION FORMED BY THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AND THE WESTERLY RIGHT-OF-WAY OF WESLEY CHAPEL ROAD AS NOW RELOCATED; RUNNING THENCE SOUTHERLY 25 DEGREES 25 MINUTES 55 SECONDS WEST A DISTANCE OF 200 FEET TO AN IRON PIN; RUNNING THENCE SOUTH 39 DEGREES 13 MINUTES 48 SECONDS WEST A DISTANCE OF 131.56 FEET TO AN IRON POINT; RUNNING THENCE SOUTH 31 DEGREES 39 MINUTES 01 SECOND WEST A DISTANCE OF 150.00 FEET TO AN IRON PIN; RUNNING THENCE NORTH 76 DEGREES 09 MINUTES 33 SECONDS WEST A DISTANCE OF 139.67 FEET TO AN IRON PIN; RUNNING THENCE NORTH 01 DEGREE 59 MINUTES 11 SECONDS EAST A DISTANCE OF 298.69 FEET TO AN IRON PIN ON THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD; RUNNING THENCE NORTH 75 DEGREES 34 MINUTES 14 SECONDS EAST ALONG THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD A DISTANCE OF 205.52 FEET TO A POINT; CONTINUING THENCE EASTERLY ALONG THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AN ARC DISTANCE OF 176.40 FEET TO THE POINT OF BEGINNING.

LESS AND EXCEPT:
ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS NOS. 126 AND 131, OF THE 15TH DISTRICT, OF DEKALB COUNTY, GEORGIA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TO FIND THE TRUE POINT OF BEGINNING, BEGIN AT AN IRON PIN ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD, AS NOW RELOCATED, A DISTANCE OF 175 FEET WESTERLY FROM THE INTERSECTION FORMED BY THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AND THE WESTERLY RIGHT-OF-WAY LINE OF WESLEY CHAPEL ROAD, AS NOW RELOCATED; RUN THENCE WESTERLY ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD A DISTANCE OF 176.4 FEET TO AN IRON PIN; THENCE CONTINUE ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD 79.64 FEET TO AN IRON PIN, WHICH IS THE TRUE POINT OF BEGINNING FOR PROPERTY HEREIN CONVEYED; THENCE SOUTH 0 DEGREE 50 MINUTES 25 SECONDS WEST A DISTANCE OF 210.63 FEET TO AN IRON PIN; THENCE WESTERLY A DISTANCE OF 125 FEET TO A POINT; THENCE NORTH 01 DEGREE 59 MINUTES 11 SECONDS EAST A DISTANCE OF 180 FEET, MORE OR LESS, TO AN IRON PIN LOCATED ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD; THENCE EASTERLY ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD A DISTANCE OF 127 FEET TO THE TRUE POINT OF BEGINNING FOR PROPERTY HEREIN CONVEYED.

LESS AND EXCEPT:
ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS NOS. 126 AND 131, OF THE 15TH DISTRICT, CONTAINING 1.00 ACRE, MORE OR LESS, AS SHOWN ON PLAT OF SURVEY BY TRAVIS PRUITT & ASSOCIATES, PC, DATED April 29, 1974, AND REVISED June 26, 1974 AND April 10, 1975, OF DEKALB COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD (SAID ROAD HAVING A 100-FEET RIGHT-OF-WAY) A DISTANCE OF 175 FEET WESTERLY FROM THE INTERSECTION FORMED BY THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AND THE WESTERLY RIGHT-OF-WAY LINE OF WESLEY CHAPEL ROAD (SAID ROAD HAVING A 150-FEET

DEED BOOK 25369 Ps 34

ALL RIGHTS, TITLE, AND INTEREST IN AND TO THAT CERTAIN ACCESS EASEMENT DATED June 8, 1972, BY AND BETWEEN NAREDEL PROPERTIES OF GEORGIA II, A LIMITED PARTNERSHIP AND PHILLIPS LAND COMPANY, INC., AS RECORDED AT DEED BOOK 3080, PAGE 549, DEKALB COUNTY, GEORGIA RECORDS.

BEING THE SAME PROPERTY AS THAT CONVEYED BY LIMITED WARRANTY DEED DATED October, 1996, FROM JAMES C. WALLACE TO CHARLES E. MCCORKLE, AS RECORDED October 29, 1996, AT DEED BOOK 9192, PAGE 628, DEKALB COUNTY, GEORGIA RECORDS.

DEED BOOK 25369 Ps 35
Debra DeBerry
Clerk of Superior Court
DeKalb County, Georgia
LOAN #: 10672

GEORGIA
GRANTOR: GB HOLDINGS OF GEORGIA, INC
LENDER: SECURED INVESTMENT FUNDING LLC
DATE OF SECURITY DEED: December 23, 2015

## WAIVER OF BORROWER'S RIGHTS

BY EXECUTION OF THIS PARAGRAPH, GRANTOR EXPRESSLY: (1) ACKNOWLEDGES THE <u>RIGHT TO ACCELERATE</u> THE DEBT AND THE <u>POWER OF ATTORNEY</u> GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NONJUDICIAL FORECLOSURE UPON DEFAULT BY GRANTOR WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE AS IS REQUIRED TO BE GIVEN UNDER THE PROVISIONS HEREOF; (2) <u>WAIVES</u> ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, THE VARIOUS PROVISIONS OF THE CONSTITUTION FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY LENDER OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO LENDER, EXCEPT SUCH NOTICE AS IS SPECIFICALLY REQUIRED TO BE PROVIDED HEREOF; (3) ACKNOWLEDGES THAT GRANTOR HAS READ THIS DEED AND SPECIFICALLY THIS PARAGRAPH AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF SAID DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THIS DEED; (4) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED-FOR LOAN TRANSACTION; AND (5) AGREES THAT THE PROVISIONS HEREOF ARE INCORPORATED INTO AND MADE A PART OF THE SECURITY DEED.

READ AND AGREED BY GRANTOR:            GB HOLDINGS OF GEORGIA, INC

Signed, sealed and delivered                                                    (SEAL)
in the presence of                     CHARLES EDWARD MCCORKLE  MEMBER -
                                       Grantor

_____                                                          (SEAL)
Witness                                                        - Grantor

_____                                                          (SEAL)
Notary Public                                                  - Grantor

_____
### CLOSING ATTORNEY'S AFFIDAVIT

Before the undersigned attesting officer personally appeared the undersigned closing attorney, who having been first duly sworn according to law, states under oath as follows:

In closing the above loan, but prior to the execution of the Deed to Secure Debt and "Waiver of Borrower's Rights" by the Borrower, I reviewed with and explained to the Borrower the terms and provisions of the Deed to Secure Debt and particularly the provisions thereof authorizing the Lender to sell the secured property by a nonjudicial foreclosure under a power of sale, together with the "Waiver of Borrower's Rights" and informed the Borrower of Borrower's rights under the Constitution of the State of Georgia and the Constitution of the United States to notice and a judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrower of Borrower's rights. After said review with and explanation to Borrower, Borrower executed the Deed to Secure Debt and "Waiver of Borrower's Rights."

Based on said review with and explanation to the Borrower, it is my opinion that Borrower knowingly, intentionally and willingly executed the waiver of Borrower's constitutional rights to notice and judicial hearing prior to any such nonjudicial foreclosure.

Sworn to and subscribed before me on the date set forth above.

THIS INSTRUMENT WAS PREPARED BY
AND RETURN TO:

**2016031741**    DEED BOOK **25398** Pg **448**

Filed and Recorded:
2/12/2016 11:22:06 AM
Debra DeBerry
Clerk of Superior Court
DeKalb County, Georgia

Janice Harper
**Secured Investment Lending, Inc.**
**1485 International Parkway, Suite 1031**
**Lake Mary, FL 32746**

15-1462 _____ SPACE ABOVE THIS LINE FOR RECORDING DATA _____

# ASSIGNMENT OF MORTGAGE

4225 Snapfinger Woods Drive, Decatur GA 30035

THIS ASSIGNMENT OF MORTGAGE (hereinafter referred to as the
"Assignment") is made as of this 12th day of January, 2016 by Secured Investment Funding, LLC
(hereinafter referred to as the "Assignor") for the benefit of, Chondrite Asset Trust, Series 2015-
OCC1. (hereinafter referred to as the Assignee). Assignee's address is US Bank Trust
Services, 60 Livingston Ave. EP-MN-WS3D, St Paul, MN 55107

## WITNESSETH:

WHEREAS, Assignor is the holder of that certain Mortgage together
with the debt and Note secured thereby, in the original principal sum of One
Hundred Eighty-Six Thousand Dollars ($186,000.00) given by Secured Investment
Funding, LLC. as "Mortgagee", which Mortgage is recorded on the Public Records
of DeKalb County Georgia at O.R. Book 25369 Page 20 and which
Mortgage encumbers and is a lien upon that certain real property described in
Exhibit "A" attached hereto and by this reference made a part hereof (hereinafter
referred to as the "Premises"); and

WHEREAS, Assignor is desirous of assigning said Mortgage, together
with the Note and the debt therein described, to Assignee; and

WHEREAS, Assignee is desirous of receiving and holding said
Mortgage, together with the Note and the debt therein described, from Assignor.

NOW, THEREFORE, for and in consideration of the sum of One
Hundred Eighty-Six Thousand Dollars ($186,000.00) paid by Assignee, and other
good and valuable consideration, the receipt and sufficiency of which is hereby
acknowledged by Assignor, Assignor does hereby make the following assignment:

1. Assignment. Assignor has granted, bargained, sold, assigned, conveyed and
transferred, and by these presents does grant, bargain, sell, assign, convey and transfer unto
Assignee, its heirs, successors and assigns, forever all of its right, title and interest in, to and
under said Mortgage described above, together with the debt and Note secured thereby; together
with any and all rights, interests and appurtenances thereto belonging; subject only to any right
and equity of redemption of said Mortgagor, its successors or assigns in the same.

2. Warranties and Representations. Assignor hereby warrants and represents that it is the present holder of the above described Mortgage and that there are no other holders of said Mortgage or any interest therein nor is there any default by mortgagor therein or in the note and debt secured thereby.

3. Governing Law. This Assignment shall be governed, construed and interpreted by, through and under the laws of the State of Florida.

4. Headings. Paragraph headings contained herein are for convenience of reference only and are not to be used in the construction or interpretation hereof.

IN WITNESS WHEREOF, Assignor has executed and delivered this Assignment to Assignee on the date hereof.

Witnesses:

Signature
Printed Name: **Janice Harper**

Signature
Printed Name: *Hannah Albro*

"Assignor"
Secured Investment Funding, LLC

Nathan Trombetti
Managing Member

---

STATE OF FLORIDA         COUNTY OF SEMINOLE

THE FOREGOING instrument was acknowledged before me this 12th Day of January, 2016, by Nathan Trombetti, Managing Partner Secured Investment Funding, LLC

Notary Public



## EXHIBIT "A"

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS NOS. 126 AND 131, OF THE 15TH DISTRICT, OF DEKALB COUNTY, GEORGIA, BEING 2.134 ACRES, MORE OR LESS, AS PER PLAT OF SURVEY BY TRAVIS N. PRUITT, SR., GRLS, DATED July 19, 1973, REVISED July 29, 1973, BEING IMPROVED PROPERTY NOW OR FORMERLY KNOWN AS 4225 SNAPFINGER WOODS DRIVE A/K/A , 2575 WESLEY CHAPEL ROAD, ACCORDING TO THE PRESENT SYSTEM OF NUMBERING IN DEKALB COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT AN IRON PIN ON THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AS NOW RELOCATED A DISTANCE OF 175 FEET WESTERLY FROM THE INTERSECTION FORMED BY THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AND THE WESTERLY RIGHT-OF-WAY OF WESLEY CHAPEL ROAD AS NOW RELOCATED; RUNNING THENCE SOUTHERLY 25 DEGREES 25 MINUTES 55 SECONDS WEST A DISTANCE OF 200 FEET TO AN IRON PIN; RUNNING THENCE SOUTH 39 DEGREES 13 MINUTES 48 SECONDS WEST A DISTANCE OF 131.56 FEET TO AN IRON POINT; RUNNING THENCE SOUTH 31 DEGREES 39 MINUTES 01 SECOND WEST A DISTANCE OF 150.00 FEET TO AN IRON PIN; RUNNING THENCE NORTH 76 DEGREES 09 MINUTES 33 SECONDS WEST A DISTANCE OF 139.67 FEET TO AN IRON PIN; RUNNING THENCE NORTH 01 DEGREE 59 MINUTES 11 SECONDS EAST A DISTANCE OF 298.69 FEET TO AN IRON PIN ON THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD; RUNNING THENCE NORTH 75 DEGREES 34 MINUTES 14 SECONDS EAST ALONG THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD A DISTANCE OF 205.52 FEET TO A POINT; CONTINUING THENCE EASTERLY ALONG THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AN ARC DISTANCE OF 176.40 FEET TO THE POINT OF BEGINNING.

LESS AND EXCEPT:
ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS NOS. 126 AND 131, OF THE 15TH DISTRICT, OF DEKALB COUNTY, GEORGIA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TO FIND THE TRUE POINT OF BEGINNING, BEGIN AT AN IRON PIN ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD, AS NOW RELOCATED, A DISTANCE OF 175 FEET WESTERLY FROM THE INTERSECTION FORMED BY THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AND THE WESTERLY RIGHT-OF-WAY LINE OF WESLEY CHAPEL ROAD, AS NOW RELOCATED; RUN THENCE WESTERLY ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD A DISTANCE OF 176.4 FEET TO AN IRON PIN; THENCE CONTINUE ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD 79.64 FEET TO AN IRON PIN, WHICH IS THE TRUE POINT OF BEGINNING FOR PROPERTY HEREIN CONVEYED; THENCE SOUTH 0 DEGREE 50 MINUTES 25 SECONDS WEST A DISTANCE OF 210.63 FEET TO AN IRON PIN; THENCE WESTERLY A DISTANCE OF 125 FEET TO A POINT; THENCE NORTH 01 DEGREE 59 MINUTES 11 SECONDS EAST A DISTANCE OF 180 FEET, MORE OR LESS, TO AN IRON PIN LOCATED ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD; THENCE EASTERLY ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD A DISTANCE OF 127 FEET TO THE TRUE POINT OF BEGINNING FOR PROPERTY HEREIN CONVEYED.

LESS AND EXCEPT:
ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS NOS. 126 AND 131, OF THE 15TH DISTRICT, CONTAINING 1.00 ACRE, MORE OR LESS, AS SHOWN ON PLAT OF SURVEY BY TRAVIS PRUITT & ASSOCIATES, PC, DATED April 29, 1974, AND REVISED June 26, 1974 AND April 10, 1975, OF DEKALB COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD (SAID ROAD HAVING A 100-FEET RIGHT-OF-WAY) A DISTANCE OF 175 FEET WESTERLY FROM THE INTERSECTION FORMED BY THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AND THE WESTERLY RIGHT-OF-WAY LINE OF WESLEY CHAPEL ROAD (SAID ROAD HAVING A 150-FEET RIGHT-OF-WAY); THENCE SOUTH 25 DEGREES 25 MINUTES 55 SECONDS WEST A DISTANCE OF 200 FEET TO AN IRON PIN; RUNNING THENCE SOUTH 39 DEGREES 13 MINUTES 48 SECONDS WEST A DISTANCE OF 103.67 FEET TO AN IRON PIN; RUNNING THENCE NORTH 88 DEGREES 00 MINUTE 49 SECONDS WEST A DISTANCE OF 102.68 FEET TO AN IRON POINT; RUNNING THENCE NORTH 0 DEGREE 50 MINUTES 25 SECONDS EAST A DISTANCE OF 210.63 FEET TO AN IRON PIN ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD; RUNNING THENCE NORTH 75 DEGREES 34 MINUTES 14 SECONDS EAST A DISTANCE OF 79.60 FEET ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD TO AN IRON PIN AND A POINT OF TANGENCY; THENCE 176.40 FEET ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD FOLLOWING A REGULAR CIRCULAR CURVE HAVING A RADIUS OF 904.93 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH:

DEED BOOK 28393 Pg 451
Debra DeBerra
Clerk of Superior Court
DeKalb County Georgia

ALL RIGHTS, TITLE, AND INTEREST IN AND TO THAT CERTAIN ACCESS EASEMENT DATED June 8, 1972, BY AND BETWEEN NAREDEL PROPERTIES OF GEORGIA II, A LIMITED PARTNERSHIP AND PHILLIPS LAND COMPANY, INC., AS RECORDED AT DEED BOOK 3080, PAGE 549, DEKALB COUNTY, GEORGIA RECORDS.

BEING THE SAME PROPERTY AS THAT CONVEYED BY LIMITED WARRANTY DEED DATED October, 1996, FROM JAMES C. WALLACE TO CHARLES E. MCCORKLE, AS RECORDED October 29, 1996, AT DEED BOOK 9192, PAGE 628, DEKALB COUNTY, GEORGIA RECORDS.

After recording return to:
STEVENS, STEVENS & OLIVER, LLC
4167 ROSWELL ROAD SUITE A
ATLANTA, GA 30342
18-548

CROSS REFERENCE:
DEED BOOK 25349, PAGE 20,
DEED BOOK 25398, PAGE 448,
DEKALB COUNTY, GEORGIA

DEED BOOK 25398, PAGE 448

"CORRECTIVE"

ASSIGNMENT

FOR VALUE RECEIVED, Secured Investment Funding, LLC, "Assignor", whose address is 483 Montgomery Place, Altamonte Springs, FL 32714, hereby grants, assigns, sets over and transfers with recourse to Choodrite Asset Trust, Series 2015-OCC1, US Bank as Trustee "Assignee", whose address 1603 Orrington, Evanston, IL 60201 Attn: Structured Finance – Choodrite Asset Trust.

Security Deed from GB Holdings of Georgia, Inc. to Secured Investment Funding, LLC dated December 23, 2015 in the original principal amount $186,000.00, recorded at Deed Book 25369, Page 20, DeKalb County, Georgia records. Property address is 4225 Snapfinger Woods Drive, Decatur, GA 30035.

IN WITNESS WHEREOF, the undersigned has executed, signed and sealed this Assignment of Security Deed, as of this 27 day of June, 2018.

Signed, sealed and delivered
in the presence of:

_____
Unofficial Witness

_____
Notary Public

(Notary Seal)

My Commission expires:

Secured Investment Funding, LLC

By: _____ [SEAL]
Title: Managing Member
Print Name: Nathan Macchilli

JANICE HARPER
MY COMMISSION # GG 149701
EXPIRES: October 9, 2021
Bonded Thru Notary Public Underwriters

2018115917    DEED BOOK **26999** Pg **146**

Filed and Recorded:
6/29/2018 3:15:45 PM
Debra DeBerry
Clerk of Superior Court
DeKalb County, Georgia

**EXHIBIT**

E

# STEVENS, STEVENS & OLIVER, LLC

## ATTORNEYS AT LAW

Ronald S. Stevens
Andrew M. Stevens
Jackson E. Oliver

4167 Roswell Road, Suite A
Atlanta, Georgia 30342

Phone:  (770) 393-8900
Fax:  (770) 392-0367

September 25, 2019

**VIA CERTIFIED FIRST CLASS AND REGULAR U.S. MAIL**

GB Holdings of Georgia, Inc.
4225 Snapfinger Woods Drive
Decatur, GA 30035

Charles Edward McCorkle
3975 Jackson Shoals Court
Lawrenceville, GA 30034

|  | RE: | Lender: | Chondrite Asset Trust, Series 2015-OCC1, US Bank as Trustee |
|---|---|---|---|
|  |  | Date of Loan: | December 23, 2015 |
|  |  | Property: | 4225 Snapfinger Woods Drive |

Dear Borrower:

PLEASE BE ADVISED THAT THIS LAW OFFICE IS ACTING AS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT.  ANY INFORMATION WILL BE USED FOR THAT PURPOSE.

This law office represents Chondrite Asset Trust, Series 2015-OCC1, US Bank as Trustee as the Lender (herein referred to as "The Lender") in their lending activities in the State of Georgia. The Lender is the holder of the Note secured by a Deed to Secure Debt from GB Holdings of Georgia, Inc., dated December 23, 2015 (hereinafter "Deed") conveying real property known as 14225 Snapfinger Woods Drive, Decatur, GA 30035 (hereinafter, "Property").

You are hereby notified by this letter that the loan is in default. Payments of principal and interest due on the Note have not been paid. The amount of the debt changes daily, because interest and other charges may vary from day to day. Therefore, you must contact the undersigned at (770) 393-8900 to find out the total amount needed to pay your debt owed. You have the right to cure the Default by paying the amount owed.

This Default must be cured by October 25, 2019. You have until October 24, 2019 to cure the Default. The Default may be cured by making payment to Stevens, Stevens & Oliver, LLC, whose address is 4167 Roswell Road, Suite A, Floor 1, Atlanta Georgia, 30342, and whose phone number is (770) 393-8900.

If you do not cure the Default by October 24, 2019, CCM Finance, LLC may accelerate the sums secured by the Deed and take steps to terminate your ownership interest in the Property by commencing a foreclosure proceeding or other action to seize your property. You have the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense to acceleration and sale.

In the event that you disagree with Lender's assertion that a default has occurred or the correctness of Lender's calculation of the amount required to cure the Default, you may contact Stevens, Stevens & Oliver, LLC and speak to Andrew M. Stevens, whose telephone number is (770) 393-8900 to express your disagreement with Lender's assertion that a default has occurred or your disagreement as to the correctness of Lender's calculation of the amount required to cure the Default.

PLEASE BE ADVISED THAT IF YOU ARE CURRENTLY OR HAVE BEEN, WITHIN THE PAST THREE (3) MONTHS, IN THE MILITARY SERVICE AND IF YOU JOINED AFTER SIGNING THE SECURITY DEED NOW IN FORECLOSURE, YOU MAY BE ENTITLED TO RELIEF UNDER THE SERVICE MEMBERS CIVIL RELIEF ACT (50 U.S.C. APP. §§ 501-596, ET SEQ). IN PARTICULAR, THE PROVISIONS CONTAINED IN 50 U.S.C. § 502 ARE DESIGNED FOR THE BENEFIT OF PERSONS IN THE MILITARY SERVICE WHOSE ABILITY TO COMPLY WITH THE TERMS OF THEIR MORTGAGE OBLIGATION IS MATERIALLY AFFECTED BY REASON OF THEIR MILITARY SERVICE. IF YOU BELIEVE THAT YOU ARE ENTITLED TO RELIEF UNDER THE SERVICE MEMBERS CIVIL RELIEF ACT OF 2003, PLEASE CONTACT OUR OFFICE IMMEDIATELY. WHEN CONTACTING THIS OFFICE AS TO YOUR MILITARY SERVICE, YOU MUST PROVIDE POSITIVE PROOF OF YOUR MILITARY STATUS. IF YOU DO NOT PROVIDE THIS INFORMATION, WE WILL ASSUME THAT YOU ARE NOT ENTITLED TO RELIEF UNDER THIS ACT.

Please note that this letter is being sent to you in order to comply with Georgia Statutory foreclosure law requirements and in no way prevents you from exercising any and all Borrower's Rights.

Sincerely,
**STEVENS, STEVENS & OLIVER, LLC**

By: Andrew M. Stevens, Esq.

cc: Chondrite Asset Trust, Series 2015-OCC1, Us Bank as Trustee

EXHIBIT

NOTICE OF SALE UNDER POWER GEORGIA, DEKALB COUNTY Under and by
virtue of the Power of Sale contained in a Security Deed given by **GB HOLDINGS OF
GEORGIA, INC.** to **SECURED INVESTMENT FUNDING, LLC** dated December
23, 2015 and recorded in Deed Book 25369, Pages 20, DeKalb County, Georgia Records
as last assigned to **CHONDRITE ASSET TRUST, SERIES 2015-OCC1,** said
assignment recorded in Deed Book 25398, Page 448, DeKalb County, Georgia records
conveying the after-described property to secure a Note in the original principal amount
of One Hundred Eighty-Six dollars and 00/100 Dollars (**$186,000.00**), with interest
thereon as set forth therein, there will be sold at public outcry to the highest bidder for
cash before the Courthouse door of DeKalb County, Georgia, within the legal hours of
sale on the first Tuesday in November 2019, the following described property, to-wit:
ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS
NOS. 126 AND 131 OF THE 15TH DISTRICT, OF DEKALB COUNTY, GEORGIA,
BEING 2.134 ACRES, MORE OR LESS, AS PER PLAT OF SURVEY BY TRAVIS N.
PRUITT, SR., GRLS, DATED JULY 19, 1973, REVISED JULY 29, 1973, BEING
IMPROVED PROPERTY NOW OR FORMERLY KNOWN AS 4225 SNAPFINGER
WOODS DRIVE A/K/A, 2575 WESLEY CHAPEL ROAD, ACCORDING TO THE
PRESENT SYSTEM OF NUMBERING IN DEKALB COUNTY, GEORGIA, AND
BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT AN
IRON PIN ON THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AS
NOW RELOCATED A DISTANCE OF 175 FEET WESTERLY FROM THE
INTERSECTION FORMED BY THE SOUTHERLY RIGHT-OF-WAY OF
SNAPFINGER ROAD AND THE WESTERLY RIGHT-OF-WAY OF WESLEY
CHAPEL ROAD AS NOW RELOCATED; RUNNING THENCE SOUTHERLY 25
DEGREES 25 MINUTES 55 SECONDS WEST A DISTANCE OF 200 FEET TO AN
IRON PIN; RUNNING THENCE SOUTH 39 DEGREES 13 MINUTES 48 SECONDS
WEST A DISTANCE OF 131.56 FEET TO AN IRON POINT; RUNNING THENCE
SOUTH 31 DEGREES 39 MINUTES 01 SECOND WEST A DISTANCE OF 150.00
FEET TO AN IRON PIN; RUNNING THENCE NORTH 79 DEGREES 09 MINUTES
33 SECONDS WEST A DISTANCE OF 139.67 FEET TO AN IRON PIN; RUNNING
THENCE NORTH 01 DEGREE 59 MINUTES 11 SECONDS EAST A DISTANCE OF
298.69 FEET TO AN IRON PIN ON THE SOUTHERLY RIGHT-OF-WAY OF
SNAPFINGER ROAD; RUNNING THENCE NORTH 75 DEGREES 34 MINUTES 14
SECONDS EAST ALONG THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER
ROAD A DISTANCE OF 205.52 FEET TO A POINT; CONTINUING THENCE
EASTERLY ALONG THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD
AN ARC DISTANCE OF 176.40 FEET TO THE POINT OF BEGINNING. LESS AND
EXCEPT: ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN
LAND LOTS NOS. 126 AND 131, OF THE 15TH DISTRICT, OF DEKALB COUNTY,
GEORGIA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: TO FIND
THE TRUE POINT OF BEGINNING, BEGIN AT AN IRON PIN ON THE
SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD, AS NOW
RELOCATED, A DISTANCE OF 175 FEET WESTERLY FROM THE
INTERSECTION FORMED BY THE SOUTHERLY RIGHT-OF-WAY OF
SNAPFINGER ROAD AND THE WESTERLY RIGHT-OF-WAY LINE OF WESLEY
CHAPEL ROAD, AS NOW RELOCATED; RUN THENCE WESTERLY ALONG THE

SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD A DISTANCE OF 176.4 FEET TO A IRON PIN; THENCE CONTINUE ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD 79.64 FEET TO AN IRON PIN, WHICH IS THE TRUE POINT OF BEGINNING FOR PROPERTY HEREIN CONVEYED; THENCE SOUTH 0 DEGREE 50 MINTUES 25 SECONDS WEST A DISTANCE OF 210.63 FEET TO AN IRON PIN; THENCE WESTERLY A DISTANCE OF 125 FEET TO A POINT; THENCE NORTH 01 DEGREE 59 MINUTES 11 SECONDS EAST A DISTANCE OF 180 FEET, MORE OR LESS, TO AN IRON PIN LOCATED ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD; THENCE EASTERLY ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD A DISTANCE OF 127 FEET TO THE TRUE POINT OF BEGINNING FOR PROPERTY HEREIN CONVEYED. LESS AND EXCEPT: ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS NOS. 126 AND 131 OF THE 15TH DISTRICT, CONTAINING 1.00 ACRE, MORE OR LESS, AS SHOWN ON PLAT OF SURVEY BY TRAVIS PRUITT & ASSOCIATES, PC, DATED APRIL 29, 1974, AND REVISED JUNE 26, 1974 AND APRIL 10, 1975 OF DEKALB COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT A POINT ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD (SAID ROAD HAVING A 100-FEET RIGHT-OF-WAY) A DISTANCE OF 175 FEET WESTERLY FROM THE INTERSECTION FORMED BY THE SOUTHERLY RIGHT-OF-WAY OF SNAPFINGER ROAD AND THE WESTERLY RIGHT-OF-WAY LINE OF WESLEY CHAPEL ROAD (SAID ROAD HAVING A 150 FEET RIGHT-OF-WAY); THENCE SOUTH 25 DEGREES 25 MINUTES 55 SECONDS WEST A DISTANCE OF 200 FEET TO AN IRON PIN; RUNNING THENCE SOUTH 39 DEGREES 13 MINUTES 48 SECONDS WEST A DISTANCE OF 103.67 FEET TO AN IRON PIN; RUNNING THENCE NORTH 88 DEGREES 00 MINUTE 49 SECONDS WEST A DISTANCE OF 102.68 FEET TO AN IRON POINT; RUNNING THENCE NORTH 0 DEGREE 50 MINUTES 25 SECONDS EAST A DISTANCE OF 210.63 FEET TO AN IRON PIN ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD; RUNNING THENCE NORTH 75 DEGREES 34 MINUTES 14 SECONDS EAST A DISTANCE OF 79.60 FEET ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD TO AN IRON PIN AND A POINT OF TANGENCY; THENCE 176.40 FEET ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF SNAPFINGER ROAD FOLLOWING A CIRCULAR CURVE HAVING A RADIUS OF 904.93 FEET TO THE POINT OF BEGINNING. TOGETHER WITH: ALL RIGHTS, TITLE AND INTEREST IN AND TO THAT CERTAIN ACCESS EASEMENT DATED JUNE 8, 1972, BY AND BETWEEN NAREDEL PROPERTIES OF GEORGIA II, A LIMITED PARTNERSHIP AND PHILLIPS LAND COMPANY, INC., AS RECORDED AT DEED BOOK 3080, PAGE 549, DEKALB COUNTY, GEORGIA RECORDS. The debt secured by said Deed to Secure Debt has been and is hereby declared due because, among other possible events of default, failure to pay the indebtedness as and when due and in the manner provided in the Note and Deed to Secure Debt. The debt remaining in default, this sale will be made for the purpose of paying the same and all expenses of this sale, as provided in the Deed to Secure Debt and by law, including attorney's fees (notice of intent to collect attorney's fees having been given).Said property will be sold subject to

any outstanding ad valorem taxes (including taxes which are a lien, but not yet due and payable), any matters which might be disclosed by an accurate survey and inspection of the property, any assessments, liens, encumbrances, zoning ordinances, restrictions, covenants, and matters of record superior to the Deed to Secure Debt first set out above. To the best of the knowledge and belief of the undersigned, the party in possession of the property is **GB HOLDINGS OF GEORGIA, INC.** or a tenant or tenants and said property is more commonly known as **4225 SNAPFINGER WOODS DRIVE, DECATUR, GA 30035.** The sale will be conducted subject (1) to confirmation that the sale is not prohibited under the U.S. Bankruptcy Code and (2) to final confirmation and audit of the status of the loan with the holder of the security deed. The entity having full authority to negotiate, amend, or modify all terms of the loan (although not required by law to do so) is: STEVENS, STEVENS & OLIVER, LLC, 4167 Roswell Road, Suite A, Floor 1, Atlanta, GA 30342, Telephone number: 770-393-8900. SECURED INVESTMENT FUNDING, LLC. 18-548.THIS LAW FIRM MAY BE HELD TO BE ACTING AS A DEBT COLLECTOR UNDER FEDERAL LAW. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

PUBLISHER'S AFFIDAVIT

The Champion Newspaper
PO Box 1347
Decatur, GA 30031-1347

Phone:    (404) 373-7779
Fax:      (404) 371-1359

STEVENS, STEVENS & OLIVER LLC
SUITE A, FLOOR 1
4167 ROSWELL ROAD NE
ATLANTA, GA 30342-3715

STATE OF GEORGIA
COUNTY OF DEKALB

Personally appeared before me, the undersigned, a Notary Public within and for said county and state,
Carolyn J. Glenn, Publisher of The Champion Newspaper, published at Decatur, County of DeKalb, State of
Georgia, and being the official organ for the publication of legal advertisements for said county, who being
duly sworn, states on oath that the report of GB HOLDINGS OF GEORGIA, INC.

was published in said newspaper on the following date(s):
10/10/19,  10/17/19,  10/24/19,  10/31/19

CAROLYN J. GLENN, PUBLISHER

Sworn to and subscribed before me this 10/31/19.

Notary Public

My commission expires September 06, 2022

THE OFFICIAL LEGAL ORGAN OF DEKALB COUNTY





United States Bankruptcy Court
Northern District of Georgia

## Notice of Bankruptcy Case Filing

A bankruptcy case concerning the debtor(s) listed
below was filed under Chapter 13 of the United States
Bankruptcy Code, entered on 11/05/2019 at 08:14 AM
and filed on 11/05/2019.



**Charles Edward Mccorkle**
4225 Snapfinger Woods Drive
Decatur, GA 30035
SSN / ITIN: xxx-xx-2512
Tax ID / EIN: 01-0930039
*dba* **GB Holdings of Georgia Inc**

The bankruptcy trustee is:

**Melissa J. Davey**
Melissa J. Davey, Standing Ch 13 Trustee
Suite 200
260 Peachtree Street, NW
Atlanta, GA 30303
(678) 510-1444

The case was assigned case number 19-67772-pmb to Judge Paul Baisier.

In most instances, the filing of the bankruptcy case automatically stays certain collection and other
actions against the debtor and the debtor's property. Under certain circumstances, the stay may be
limited to 30 days or not exist at all, although the debtor can request the court to extend or impose a stay.
If you attempt to collect a debt or take other action in violation of the Bankruptcy Code, you may be
penalized. Consult a lawyer to determine your rights in this case.

If you would like to view the bankruptcy petition and other documents filed by the debtor, they are
available at our *Internet* home page http://ecf.ganb.uscourts.gov/index.html or at the Clerk's Office,
1340 United States Courthouse, 75 Ted Turner Drive SW, Atlanta, GA 30303.

You may be a creditor of the debtor. If so, you will receive an additional notice from the court setting
forth important deadlines.

**M. Regina Thomas**
**Clerk, U.S. Bankruptcy**
**Court**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

IN RE:                                          )
                                                )
GB HOLDING OF GEORGIA, INC.,                    )
                                                )
    Debtor.                   )        CASE NO. 1:19-bk-67772
_____)
                                                )        CHAPTER 13
CHONDRITE ASSET TRUST,                          )
SERIES 2015-OCC1, US BANK                       )        JUDGE PAUL M. BAISIER
AS TRUSTEE,                                     )
                                                )
    Movant,                   )
                                                )
v.                                              )
                                                )
CHARLES EDWARD MCCORKLE,                        )
                                                )
    Respondent.               )
                                                )

## NOTICE OF HEARING

PLEASE TAKE NOTICE that Chondrite Asset Trust, Series 2015-OCC1, US Bank as Trustee, Movant in the above-styled action, has filed a MOTION FOR RELIEF FROM STAY and related papers with the Court seeking an Order lifting the stay in the above-styled action in order to proceed with the foreclosure of 4225 Snapfinger Woods Drive, Decatur, Dekalb County, Georgia 30035. PLEASE

5

TAKE FURTHER NOTICE that the Court will hold a hearing on the MOTION FOR RELIEF FROM STAY in Courtroom 1202 United States Courthouse, 75 Ted Turner Drive, S.W., Atlanta, Georgia at 1:30 p.m. on December 5, 2019.

Your rights may be affected by the Court's ruling on these pleadings. You should read these pleadings carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.) If you do not want the Court to grant the relief sought in these pleadings or if you want the Court to consider your views, then you and/or your attorney must attend the hearing. You may also file a written response to the pleading with the Clerk at the address stated below, but you are not required to do so. If you file a written response, you must attach a certificate stating when, how and on whom (including addresses) you served the response. Mail or deliver your response so that it is received by the Clerk at least two business days before the hearing. The address of the Clerk's Office is: Clerk, U.S. Bankruptcy Court, Suite 1340, 75 Ted Turner Drive, S.W., Atlanta, Georgia 30303. You must also mail a copy of your response to the undersigned at the address stated below.

If a hearing on the Motion for Relief from the Stay cannot be held within thirty (30) days, Movant waives the requirement for holding a preliminary hearing

within thirty (30) days of filing the motion and agrees to a hearing on the earliest

possible date.  If a final decision cannot be rendered by the Court within sixty (60)

days of the date of the request, Movant waives the requirement that a final decision

be issued within that period.  Movant consents to the stay remaining in effect until

the Court orders otherwise.

   This 15th day of November, 2019.

      **STEVENS, STEVENS & OLIVER, LLC**

      */s/ Andrew M. Stevens*
      Andrew M. Stevens
      Georgia Bar No. 680632
      *Attorney for Plaintiff*

4167 Roswell Road, Suite A Floor 1
Atlanta, Georgia 30342
(T) (770) 393-8900
(F) (770) 392-0367
astevens@lawstevens.com

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **GB HOLDINGS OF GEORGIA, INC.,** | ) | |
| | ) | |
| Debtor. | ) | **CASE NO. 1:19-bk-67772** |
| ———————————————— | ) | |
| | ) | **CHAPTER 13** |
| **CHONDRITE ASSET TRUST,** | ) | |
| **SERIES 2015-OCC1, US BANK** | ) | **JUDGE PAUL M. BAISIER** |
| **AS TRUSTEE,** | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **CHARLES EDWARD MCCORKLE,** | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## <u>PROPOSED ORDER</u>

It appearing that the above-styled action having come on before this Court

on December 5, 2019 on Chondrite Asset Trust, Series 2015-OCC1, US Bank as

and it appearing that there was sufficient notice to the Debtor rewarding said

Motion and hearing thereon, and it appearing that movant has a legal right to

foreclose on the property known as 4225 Snapfinger Drive, Decatur, Dekalb

8

County, Georgia 30035, and it appearing that the Trustee has not raised any objections to the subject Motion, Chondrite Asset Trust, Series 2015-OCC1, US Bank as Trustee's MOTION FOR RELIEF FROM STAY is hereby GRANTED.

IT IS HEREBY ORDERED, DECREED, AND ADJUDGED that Chondrite Asset Trust, Series 2015-OCC1, us Bank as Trustee's MOTION FOR RELIEF FROM STAY pursuant to 11 U.S.C. § 362(d) is GRANTED and the automatic stay is hereby modified to permit Chondrite Asset Trust, Series 2015-OCC1, us Bank as Trustee to continue foreclosure proceedings against the Debtor. END DOCUMENT.

Prepared and presented by:

*/s/ Andrew M. Stevens*
Andrew M. Stevens
Georgia Bar No. 680632
Stevens, Stevens & Oliver, LLC
4167 Roswell Rd., Suite A, Floor 1
Atlanta, Georgia 30342
*Attorney for Movant*

_____
Melissa J. Davey
260 Peachtree Street, NW
Suite 200
Atlanta, Georgia 30303
*Bankruptcy Trustee for GB Holding of Georgia, Inc.*
Distributed to:

**Andrew M. Stevens**
Stevens, Stevens & Oliver, LLC
4167 Roswell Rd., Suite A, Floor 1
Atlanta, Georgia 30342
*Attorney for Movant*

**GB Holdings of Georgia, Inc.**
4225 Snapfinger Woods Drive
Decatur, GA 30035
*Debtor*

**Charles Edward McCorkle**
3975 Jackson Shoals Court
Lawrenceville, GA 30034
*Respondent*

**Melissa J. Davey**
260 Peachtree Street, NW
Suite 200
Atlanta, Georgia 30303
*Bankruptcy Trustee for GB Holdings of Georgia, Inc.*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

IN RE:                                    )
                                      )
**GB HOLDINGS OF GEORGIA, INC.,**         )
                                      )
   Debtor.                 )        **CASE NO. 1:19-bk-67772**
_____)
                                      )        **CHAPTER 13**
**CHONDRITE ASSET TRUST,**                )
**SERIES 2015-OCC1, US BANK**             )        **JUDGE PAUL M. BAISIER**
**AS TRUSTEE**                            )
                                      )
   Movant,                 )
                                      )
v.                                        )
                                      )
**CHARLES EDWARD MCCORKLE,**              )
                                      )
   Respondent.             )
                                      )

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the undersigned has on this day served a true and correct copy of the within and foregoing **MOTION FOR RELIEF FROM STAY, NOTICE OF HEARING, and PROPOSED ORDER** by first class U.S. Mail with adequate postage prepaid on the following persons or entities at the addresses stated:

11

GB Holdings of Georgia, Inc.
4225 Snapfinger Woods Drive
Decatur GA 30035
*Debtor*

Charles Edward McCorkle
3975 Jackson Shoals Court
Decatur, GA 30034
*Respondent*

Melissa J. Davey
260 Peachtree Road, NW
Suite 200
Atlanta, Georgia 30303
*Bankruptcy Trustee for GB Holdings of Georgia, Inc.*

Michael J. Bargar
Arnall Golden Gregory LLP
171 17th Street N.W., Suite 2100
Atlanta, Georgia 30363
*Attorney for Bankruptcy Trustee*

This 15th day of November, 2019.

*/s/ Andrew M. Stevens*
Andrew M. Stevens
**STEVENS, STEVENS & OLIVER, LLC**
Georgia Bar No. 680632
*Attorney for Movant*

4167 Roswell Rd., Suite A, Floor A
Atlanta, GA 303242
(t) 770-393-8900
(f) 770-392-0367
astevens@lawstevens.com